# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CLAUDDETTE GERONIMO,** | : |
| | : |
| **Plaintiff,** | : |
| v. | : 3:20-CV-02145 |
| | : (JUDGE MARIANI) |
| **POTTSVILLE FORD d/b/a/** | : |
| **SANDS FORD OF POTTSVILLE** | : |
| | : |
| **Defendant.** | : |

## MEMORDANDUM OPINION

### I. INTRODUCTION

On November 18, 2020, Plaintiff Claudette Geronimo filed a Complaint against Defendant Pottsville Ford, d/b/a/ Sands Ford of Pottsville. (*See* Doc. 1). The Complaint alleges a violation of the Americans with Disabilities Act (Count I), discrimination based on sex in violation of Title VII of the Civil Rights Act of 1964 (Count II), and discrimination based on national origin in violation of Title VII of the Civil Rights Act of 1964 (Count III) in connection with Plaintiff's employment with Defendant. (*Id.*). Presently before the Court is Defendant's Motion of Dismiss Counts I, II, and III of Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Doc. 7). For the reasons that follow, the Court will grant in part and deny in part Defendant's Motion to Dismiss.

## II. FACTUAL ALLEGATIONS

Plaintiff's Complaint alleges the following facts which, for the purposes of resolving Defendant's Motion to Dismiss, the Court takes as true:

Plaintiff worked as salesperson for Defendant beginning in or around December 2019 and lasting until her termination on or about March 24, 2020. (Doc. 1, ¶¶ 11, 39). "Plaintiff has a history of asthma and dyslexia, which she had disclosed to [Defendant] upon her hire[.]" (*Id.* at ¶ 15). Plaintiff also informed Defendant that "she cannot anticipate when she will have an asthma attack nor can she gauge how it will impact her." (*Id.* at ¶ 16).

When Plaintiff arrived to work on January 8, 2020, she "suffered an excruciating and debilitating asthma attack with no warning" and "felt like she was going to die." (*Id.* at ¶¶ 17, 18). Plaintiff "approached Brandon Buckheart and Larry Buck in the manager's office and told them she was having an asthma attack" and "begged them to call 911." (*Id.* at ¶¶ 18, 19). Mr. Buckheart and Mr. Buck "treated [Plaintiff] as if she were crazy and continued to work" without offering assistance. (*Id.* at ¶¶ 20-21). Plaintiff then went to another employee, Rose Lapp, "and begged for help again." (Doc. 1 at ¶ 21). Ms. Lapp did not assist Plaintiff and instead, "demanded that Plaintiff get away from her as she did not want to become ill and also refused to assist Plaintiff in her medical emergency." (*Id.* at ¶ 21).

"Plaintiff then made her way slowly to her desk and fumbled for her inhaler and made her way outside, in zero degree weather, for air." (*Id.* at ¶ 23). When Plaintiff went back inside, none of Defendant's employees asked if she was okay or offered to help her. (*Id.* at

¶ 24). Shortly thereafter, Plaintiff "had an even stronger asthma attack and went to the manager and told him she needed to go to the hospital. The manager merely said, 'okay, go' and offered zero assistance." (*Id.* at ¶ 25). Plaintiff called 911 herself and an ambulance transported her to the hospital, where she was treated for a high heart rate. (Doc. 1 at ¶ 26). Because Plaintiff did not receive immediate medical treatment, she was on medication for one month. (*Id.* at ¶ 27). The Monday following Plaintiff's asthma attack, Plaintiff returned to work with a doctor's note. (*Id.* at ¶ 28).

On or about January 13, 2020, Plaintiff was told that if she did not sell 30 cars in the month she would be terminated. (*Id.* at ¶ 29). Mr. Sands reminded Plaintiff of this quota on or about February 1, 2020 when, up to that point, Plaintiff had only sold six cars. (*Id.* at ¶ 33). Plaintiff explained that her ability to make sales "was out of her hands" because many customers had poor credit or were waiting to receive their tax refund. (Doc. 1 at ¶ 33).

On or about January 14, 2020, Mr. Buck told Plaintiff "that he had a son [her] age who also has a disability and he can sell more cars than she can." (*Id.* at ¶ 30). Additionally, Defendant's agents told Plaintiff that "she doesn't know how to talk" and she needs to learn how to talk because she speaks with an accent since her parents are from the Dominican Republic. (*Id.* at ¶ 31).

"On or about December 13, 20[19]," one of Defendant's employees mistreated Plaintiff in front of a customer, causing the customer to comment on it and discouraging the customer from doing business with Defendant. (*Id.* at ¶ 32). One of Plaintiff's co-

3

employees then said he would deal with the customer, which prevented Plaintiff from making a sale to help her meet the sales quota. (*Id.*)

Mr. Sands "berated [Plaintiff] for being late," when Plaintiff arrived at 9:01 one day and when Plaintiff said she had to park further away than she usually did, Mr. Sands "yelled at her that she was a liar." (Doc. 1 at ¶ 34). Furthermore, Mr. Sands "spoke angrily at her, claiming she was going around bothering co-workers." (*Id.* at ¶ 35). Plaintiff explained to Mr. Sands that she was not bothering co-workers, but instead, "was merely asking for help as this was her first dealership job, everything was new to her and she was trying to learn her job properly." (*Id.*).

"On or about March 24, 2020" Defendant temporarily closed the dealership because of the COVID-19 pandemic and sent employees, including Plaintiff, home and Mr. Sands advised Plaintiff that he would let her know when the dealership would be reopened. (*Id.* at ¶¶ 36, 37). Plaintiff contacted Chris Halven, another employee of Defendant, for more information regarding the dealership closure and he told Plaintiff that "if Mr. Sands didn't tell her or email her then she should apply for unemployment." (*Id.* at ¶ 38).

On April 10, 2020, Plaintiff emailed Mr. Halven to follow up on the situation and he responded on the same day, saying "a letter was mailed out to her on March 24, 2020 advising her that she was no longer an employee of Sands Ford." (Doc. 1 at ¶ 39). "Other employees with less seniority were not terminated," including "one male employee, who was hired after Plaintiff, [who] had not met the quota and was still employed after Plaintiff was

4

terminated." (*Id.*). When Plaintiff was terminated, Defendant failed to pay Plaintiff her vacation and sick days to compensate her for the dealership closure. (*Id.* at ¶ 40).

## III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule Civil Procedure 12(b)(6), if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Offs.*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted). Thus, "the

presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal*, 556 U.S. at 678). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 786-787 (quoting *Iqbal*, 556 U.S. at 679).

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

6

## IV. ANALYSIS

### A. *Count I – Americans with Disabilities Act*

In Count 1 of her Complaint, Plaintiff alleges a failure to accommodate claim under the Americans with Disabilities Act ("ADA") for the events associated with her January 8, 2020 asthma attack and for comments perceived to be associated with her dyslexia. (Doc. 1 at ¶¶ 41-49).[1]

Under the Americans with Disabilities Act ("ADA"), an employer may not "discriminate against a qualified individual on the basis on disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination under this provision includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ..., unless such covered entity can demonstrate that the accommodation would pose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

---

[1] Plaintiff makes it clear in the Brief in Opposition to the Motion to Dismiss (Doc. 11) that Count I is a failure to accommodate claim under the ADA. Plaintiff alleges:
> Defendant did not provide [Plaintiff] with a reasonable accommodation and instead, belittled her for asking questions of co-workers to become better at her job. These clear and convincing facts show that Plaintiff has met the burden for a prima facie case by the following: 1. She had a disability; 2. Defendant had notice of the disability; 3. She could perform the essential functions of her position with a reasonable accommodation; and 4. Defendant failed to provide a reasonable accommodation. Plaintiff, in her Complaint showed that she met the requirements for a prima facie case in that from Day 1, Defendant was aware and was even faced with not only her learning disability, but her severe asthma attacks requiring her to go to the hospital wherein she was told had she gotten help sooner, she would not have been required to be on medication for a month.

(Doc. 11 at 10-11).

7

The Court begins its analysis with whether Plaintiff has a disability within the meaning of the ADA. The term "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The term "major life activities" includes, *inter alia*, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). The implementing regulations of the ADA Amendments Act ("ADAAA") of 2008 make clear that:

> The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA. Consistent with the Amendment Act's purpose of reinstating a broad scope of protection under the ADA, the definition of "disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability. The question of whether an individual meets the definition of disability under this part should not demand extensive analysis.

29 CFR § 1630.1(c)(4); *see also* 29 C.F.R. § 1630.2(j)(1)(iii) ("The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive

analysis."). "The determination of whether an impairment substantially limits a major life activity requires an individualized assessment." 29 CFR § 1630.2(j)(1)(iv).

In her Complaint, Plaintiff alleges that she is an individual with disabilities as defined by the ADA because she "has a history of asthma and dyslexia." (Doc. 1 at ¶ 15). Defendant asserts that Plaintiff "fails to properly allege a 'disability' within the meaning of the ADA" because she "claims in only the most conclusory manner that she has a 'disability' within the meaning of the ADA." (Doc. 8 at 5).

Plaintiff contends that asthma "requires care and treatment requiring the modification of a person's activities and the administration of medications to control the asthma condition" and that "she cannot anticipate when she will have an asthma attack nor can she gauge how it will impact her." (Doc. 1 at ¶ 44). Concerning her dyslexia, Plaintiff claims that dyslexia "requires [that] she be given additional time for any reading, testing and comprehension." (*Id.*). Beyond these statements, Plaintiff does not allege how her conditions impact her on an individual level and instead, she relies on generic statements of how asthma and dyslexia generally impact people with these conditions. Indeed, Plaintiff's Complaint seems to suggest that the mere existence of her asthma and dyslexia diagnoses are sufficient to meet the ADA's definition of disability.

Given the interpretive guidance in the ADAAA, however, the Court finds that, though the pleadings lack specificity, Plaintiff has plead the qualifying disabilities of asthma and dyslexia for purposes of the ADA. While not explicitly stated in Plaintiff's Complaint, it can

9

be reasonably inferred that asthma impacts the major life activity of breathing, especially during an asthma attack. *See Bertig v. Julia Ribaudo Healthcare Grp., LLC*, 2016 WL 3683439, at *4 (M.D.P.A. July 12, 2016) ("Regarding plaintiff's asthma, her condition limits her ability to breathe, a recognized major life activity."); *see also* Doc. 11 at 8 (noting that "asthma clearly affects one's ability to breath[e], sometimes walking and being able to function in general."). Therefore, Plaintiff's asthma is considered a disability under the ADA.

Plaintiff further alleges that her dyslexia impacts "reading, testing and comprehension," which provides little detail as to how the condition impacts her work duties as a salesperson. Plaintiff adds some additional detail in the Brief in Opposition (Doc. 11),[2] alleging that "[h]er dyslexia affects her ability to learn in as quick a fashion as others can. She struggles with reading and following written directions." (Doc. 11 at 10). However, the ADAAA explains that determining whether an individual has a qualifying disability "should not demand extensive analysis." 29 CFR § 1630.1(c)(4). Therefore, Plaintiff's dyslexia is also a qualifying disability within the meaning of the ADA.

Accordingly, Plaintiff is considered an individual with disabilities under the ADA.

To establish a *prima facie* case of failure to accommodate under the ADA, the plaintiff must demonstrate that "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer

---

[2] Although Plaintiff filed Docket Number 11 with the title "Answer to the Defendant, Pottsville Ford, Inc., d/b/a/ Sands Ford of Pottsville's Motion to Dismiss Plaintiff's Complaint," the Court treats this filing as Plaintiff's Brief in Opposition to Defendant's Motion to Dismiss.

10

did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.'" *Moore v. CVS Rx Servs., Inc.*, 142 F. Supp.3d 321, 335 (M.D.P.A. 2015).

Plaintiff alleges, and Defendant does not deny, that she disclosed her history of asthma and dyslexia to Defendant upon her hire. (Doc. 1 at ¶ 16). Therefore, the first element of a failure to accommodate claim is plausible for purposes of the motion to dismiss.

Next, the Court turns its analysis to whether Plaintiff requested a reasonable accommodation for her disability. The ADA states that "reasonable accommodation" includes "making existing facilities used by employees readily accessible to and usable by individuals with disabilities" and "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(A)-(B).

The Court will first address the events associated with Plaintiff's asthma attack on January 8, 2020. Plaintiff alleges that she requested assistance from three of her coworkers during the attack and "begged them to call 911" and "begged for help," but none of them helped her or "offered to get her to the hospital." (Doc. 1 at ¶ 17-26). The basis for Plaintiff's failure to accommodate claim is that she "was deprived of immediate, necessary

11

medical care by agents of Defendant" during her January 8, 2020 asthma attack. (Doc. 1 at ¶ 48).

The denial of medical treatment is not recognized as a reasonable accommodation under the ADA and, thus, falls outside of the scope of the ADA's coverage. *See Iseley v. Beard*, 200 Fed. Appx. 137, 142 (3d. Cir. 2006) ("Iseley does not claim that he was excluded from any program on the basis of his disability. Rather he claims that he was denied medical treatment for his disabilities, which is not encompassed by the ADA's prohibitions."); *see also Davila v. Cnty. Of Lackawanna*, 2013 WL 1628261, at *4 (M.D.P.A. April 15, 2013) ("Furthermore, the court agrees with Judge Schwab that the ADA does not cover so-called 'denial of treatment' cases.") (citation omitted). While co-workers should be encouraged to assist one another during times of medical distress, neglecting to do so does not, by itself, give rise to a failure to accommodate claim under the ADA.

Plaintiff's claim that Defendant "deprived her of immediate, necessary medical care" during her asthma attack is, in essence, a request for medical treatment or assistance, which is not a reasonable accommodation contemplated by the ADA. Therefore, it cannot form the basis of Plaintiff's failure to accommodate claim. As such, Plaintiff fails to state a claim for failure to accommodate under the ADA for the events associated with her January 8, 2020 asthma attack.

Next, the Court will address Plaintiff's allegations in Count I that she "was derided by an agent of Defendant for her disability during her employment with Defendant." (Doc. 1 at

¶ 49). It is unclear to what exactly this allegation refers, but it is likely in relation to Plaintiff's claim that Mr. Sands, an agent of Defendant, "spoke angrily at her, claiming she was going around bothering co-workers" when she asked them for help. (Doc. 1 at ¶ 35).

In her Complaint, Plaintiff does not describe what reasonable accommodations she required or requested, nor does she describe what reasonable accommodations Defendant denied. Plaintiff says that when Mr. Sands told her that she was bothering co-workers, "[s]he advised him that she was not, she was merely asking for help as this was her first dealership job, everything was new to her and she was trying to learn her job properly." (Doc. 1 at ¶ 35). This allegation, however, is devoid of a direct or indirect reference to her dyslexia or any accommodation Plaintiff requested because of it. Many people with or without a disability need to ask co-workers questions when they start a new job, and asking for help, without more, does not indicate Mr. Sands' comment related to her dyslexia. "When Plaintiff does not provide the Court with any indication of what occurred to support her disability allegations, the Court cannot engage in the necessary 'individualized assessment' to determine whether she can state a claim under the ADA." *Oliver v. Scranton Materials Inc.*, 2015 WL 1003981, at *8 (M.D.P.A. March 5, 2015). Accordingly, Plaintiff fails to state a claim for failure to accommodate under the ADA based on accommodations for her dyslexia.

Therefore, the Court grants Defendant's Motion to Dismiss Count I of Plaintiff's Complaint without prejudice.

### B. *Counts II & III – Title VII Discrimination*

Next, the Court turns to Count II and Count III of Plaintiff's Complaint for discrimination based on sex and discrimination based on national origin, respectively, in violations of Title VII of the Civil Rights Act of 1964. Title VII prohibits discrimination by an employer against an individual on the basis of that individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). A plaintiff can prove discrimination on a direct basis, which requires direct evidence of discriminatory animus. *Walden v. Georgia Pacific Corp.*, 126 F.3d 506, 513 (3d Cir. 1997); *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 269 (3d. Cir. 2010). Alternatively, a plaintiff can prove discrimination on an indirect basis by satisfying the three-step burden-shifting analysis set forth in *McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973); *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013); *see also Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006) ("To prevail on a claim for gender discrimination under Title VII … , [plaintiff] must satisfy the three-step burden-shifting inquiry laid out in *McDonnell Douglas*.").

Under the *McDonnell Douglas* framework, Plaintiff must first establish a *prima facie* case of disparate treatment, which requires a showing that: "1) he is a member of a protected class; 2) he was qualified for the position; 3) he was subjected to an adverse employment action; and 4) the circumstances of the adverse action imply discrimination." *Dalickas v. Summit Ridge Biosystems, Inc.*, 2011 WL 4565770, at *4 (M.D.P.A. Sept. 29,

2011) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003)). "A plaintiff may also meet the last element by showing that the adverse employment action 'occurred under circumstances that could give rise to an inference of intentional discrimination.'" *Id.* (quoting *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)). "The central focus of the prima facie case is always whether the employer is treating some people less favorably than others because of their [membership in a protected class]." *Sarullo*, 352 F.3d at 789.

In response to Plaintiff's *prima facie* showing, the burden shifts "to offer a legitimate non-discriminatory [justification] for the adverse employment action." *Burton*, 707 F.3d at 426 (quoting *Smith v. City of Allentown*, 589 F.3d 684, 690 (3d. Cir. 2009)). "This burden is relatively light and is satisfied if the employer provides evidence, which if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Id.* (citing *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2007)). "At this stage, 'the defendant need not prove that the articulated reason actually motivated its conduct.'" *Id.* (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d. Cir. 2003)). At the pleading stage, a plaintiff must only plead enough facts to state a plausible claim for relief under the *McDonnell Douglas* standard. *See Connelly*, 809 F.3d at 788-89 ("[A]t least for purposes of pleading sufficiency, a complaint need not establish a *prima facie* case in order to survive a motion to dismiss.").

                i.        *Count II – Gender Discrimination*

Count II of Plaintiff's Complaint alleges gender discrimination in violation of Title VII. In this case, the parties do not dispute the first three elements of a Title VII claim – that Plaintiff is a member of a protected class as a woman, she was qualified for the salesperson position, and that she was terminated on or about March 24, 2020 – of Plaintiff's Title VII gender discrimination claim. Therefore, the Court's analysis will focus on the fourth element of this claim to determine whether Plaintiff has plausibly alleged that the circumstances of her termination imply discrimination.

In Count II, Plaintiff claims that agents of Defendant were in violation of Title VII because " Plaintiff was derided by aforementioned agent by comparing his son's abilities to Plaintiff's abilities," "Plaintiff, a female and protected class, was terminated for not meeting an alleged quota of thirty vehicles while another employee, a male, who was hired after Plaintiff, was still able to continue his employment," and because Defendant "used employment practices that had the effect of discrimination against Plaintiff due to sex." (Doc. 1 at ¶¶ 56-58).

Defendant argues that Plaintiff fails to state a cognizable Title VII claim for gender discrimination and contends that her only allegation of gender discrimination is that she was terminated for not meeting the sales quota, while a male employee with less experience was not terminated. (Doc. 8 at 8-9). Defendant continues, "Plaintiff herself has proffered multiple bases for her own termination, including arriving late to work; failing to meet her

sales quota; and bothering her coworkers." (*Id.* at 9). In response, Plaintiff asserts that Defendant is "cherry picking the allegations and choosing to ignore Plaintiff's allegations and facts detailed in the Complaint itself." (Doc. 11 at 13).

At this point in the proceedings, the Court is satisfied that Plaintiff has plausibly alleged a prima facie case of gender discrimination in violation of Title VII. Plaintiff alleges that a male employee with less seniority and who, like Plaintiff, had not met the sales quota was still employed with Defendant after Plaintiff was terminated on or about March 24, 2020. (Doc. 1 at ¶ 39). On its face, Plaintiff's claim that Defendant discriminated against her based on her gender is plausible and, therefore, Defendant's Motion to Dismiss Count II of Plaintiff's Complaint is denied.

ii. *Count III – National Origin Discrimination*

Plaintiff's third and final claim is a Title VII claim for discrimination based on national origin. (Doc. 1 at ¶¶ 59-64). As was the case with Plaintiff's gender discrimination claim, the parties do not dispute the first two elements of Plaintiff's discrimination based on national origin claim, namely, that Plaintiff is a member of a protected class an individual from the Dominican Republic and that she was qualified for the salesperson position. As such, the Court will focus its analysis on the third and fourth elements of this claim.

The Court will first determine whether Plaintiff suffered an adverse employment action. Adverse employment actions include, *inter alia*, "hiring firing, failing to promote, reassignment, or a decision causing significant change in benefits." *Sherrod v. Phila. Gas*

*Works,* 57 Fed. Appx. 68, 73 (3d. Cir. 2003) (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761 (1998). "Unnecessary derogatory comments do not rise to the level of adverse employment actions." *Rosati v. Colello,* 94 F. Supp.3d 704, 714 (E.D.P.A. 2015).

Plaintiff alleges that she spoke with a Dominican accent because her parents are from the Dominican Republic and, because of her accent, "[f]ellow employees have said and made passing comments such as Plaintiff should read to learn how to talk." (Doc. 1 at ¶¶ 31, 62). Plaintiff also contends that "she was treated differently based on her national origin" and that "she was mocked and disparaged against based not only her national origin but her Dominican accent." (Doc. 1 at ¶¶ 63-64). In response, Defendant argues that "Plaintiff's sole allegation in support of her national origin claim is that other employees mocked her accent. There is no basis in the Complaint to infer that such comments, even if said, constitute a discriminatory employment practice or policy adopted, followed or condoned by Defendant." (Doc. 8 at 9).

Plaintiff makes additional factual averments in her Brief in Opposition to the Motion to Dismiss that were not included in her Complaint. For example, Plaintiff alleges that "a younger, male employee of American origins, was allowed to continue employment, despite also not meeting the alleged quota" and that she "was terminated for not meeting a quota yet a younger, male employee from this country was allowed to continue employment." (Doc. 11 at 8, 13). In her Complaint, Plaintiff does not allege that Defendant terminated her employment based on her national origin, nor does she allege that the male employee who

18

was still employed with Defendant after Plaintiff was terminated was of "American origins" or "from this country."

"To the extent that [Plaintiff] attempts to amend her pleading through [her] Brief in Opposition, it is 'axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'" *Bilby v. Hoffman*, 2016 WL 859672, at *1 n. 1 (M.D.P.A. Jan. 27, 2016) (quoting *Commonwealth of Pennsylvania ex rel. Zimmerman v. PepsiCo., Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)). Accordingly, the Court cannot properly consider Plaintiff's supplemental factual averments in her Brief in Opposition.

Based on the averments made in the Complaint, Plaintiff's only allegations that support Count III are that her coworkers mocked her accent and that she needed to read to learn how to talk. Because "unnecessary derogatory comments do not rise to the level of adverse employment actions," Plaintiff fails to plausibly allege that she suffered an adverse employment action to satisfy the third element of her Title VII discrimination based on national origin claim. As such, the Court must grant Defendant's Motion to Dismiss the Count III of the Complaint without prejudice.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss (Doc. 7) will be granted in part and denied in part. A separate Order follows.

_____
Robert D. Mariani
United States District Judge